UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Douglas STEELE, aka Miles Sherman, Defendant-Appellant.

Nos. 85–1036, 85–1045.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 13, 1986.

Decided March 24, 1986.

Brian L. Sullivan, Asst. U.S. Atty., Reno, Nev., for plaintiff-appellee.

Richard L. Davenport, Davenport & Perry, Reno, Nev., for defendant-appellant.

Before GOODWIN, WALLACE and ALARCON, Circuit Judges.

ALARCON, Circuit Judge.

Charles Douglas Steele appeals from his conviction for two counts of copyright infringement in violation of 17 U.S.C. § 506(a) (West Supp.1985) and 18 U.S.C. § 2319(b)(2)(B) (West Supp.1985). He was also charged with conspiracy to infringe on motion picture copyrights by reproducing and distributing copies for the purpose of commercial advantage and private financial gain. This charge was dismissed after the jury indicated it was unable to reach a verdict.

## I. ISSUES

Steele contends that reversal of the judgment is compelled on the following grounds:

1. The trial court abused its discretion in denying his motion for a new trial because the record shows that the jury consulted a dictionary without court approval.

2. The use of the dictionary violated Rule 43 of the Federal Rules of Criminal Procedure which guarantees the presence of the defendant at every stage of the trial.

3. The trial court erred in denying his motion for a judgment of acquittal because the government's evidence was insufficient to sustain a conviction of the offenses charged against him.

4. He was denied effective assistance by counsel because of the failure to object to certain evidence offered by the government and to present the testimony of persons listed as defense witnesses.

5. The verdicts were inconsistent because the jury could not agree on a verdict concerning the charge of conspiracy but

found him guilty of the remaining counts as an aider and abettor for the commission of the same conduct charged as overt acts.

We have concluded that the bailiff committed misconduct in furnishing a dictionary to the jury without court authorization but that no prejudice has been shown. Because no error has been demonstrated regarding the remaining contentions, we affirm. We discuss each issue and the facts relevant thereto under separate headings.

## II. DISCUSSION

A. Unauthorized Use of a Dictionary by the Jury

The jury returned its verdict in this matter on October 12, 1984. On October 19, 1984, the court ordered counsel to appear and advised them that on October 12, 1984, at approximately 3:00 p.m., the jury asked the bailiff to furnish it with a dictionary. The bailiff provided the jury with a copy of Webster's Third International Dictionary without informing the court or counsel. The court requested that counsel file points and authorities regarding the legal effect of the jury's unauthorized use of the dictionary. The parties were also directed to propose questions to be asked of the jurors by the court. The court, after considering the points and authorities filed by the parties, issued a minute order on November 5, 1984 setting forth 17 questions to be asked of the jury foreman. On November 26, 1984, the jury foreman was questioned by the court. He testified that during the afternoon of the last day of deliberations, he had requested that the bailiff provide the dictionary at the suggestion of one of the jurors. The dictionary was in the jury room for two hours. Three of the jurors looked at the dictionary during deliberations. The jurors looked up the words "conspiracy" and "concerted" in the dictionary. The foreman had no knowledge as to whether the jurors sought out the definitions of any other words. These same jurors discussed the definitions but none of the other jurors heard their com-

ments. The foreman asked these jurors to reread the instructions. They complied.

On December 7, 1984, the court examined juror Malvina Sullivan. She substantially corroborated the foreman's testimony concerning the use of the dictionary during deliberations. She also testified that the dictionary was used to determine the meaning of the word "conspiracy" and for no other purpose. The dictionary was in the jury room no more than two hours. She could not recall any general discussion of the dictionary definitions.

On the same date, the court questioned juror Debra Ann Bates. She recalled that the bailiff supplied the jurors with a dictionary. She estimated the dictionary was in the jury room for 11 hours. Four or five jurors looked at the dictionary. Several jurors looked up the definition of the words "conspiracy," "conspirator," "infringement," "copyright," "doubt," and other "legal terminology" she could not recall. The definitions were read out loud. All the jurors could hear the reading of the definitions. Two of the jurors discussed the definitions.

After hearing this testimony, the court determined that the remaining jurors would be called to testify. On January 4, 1985, the court examined eight jurors. On January 7, 1984, the court examined the twelfth juror.

Each juror was asked the same questions. Their testimony generally corroborated the foreman's recollection of the events involving the use of the dictionary except that the time estimates varied. Three jurors believed the dictionary was in the jury room approximately two hours. Two believed the dictionary was present about four hours. Two estimated that it was there five to six hours. Juror Alice Benevides testified that she thought the word "plagiarism" was looked up in the dictionary but she was not sure.

On January 18, 1985, Steele filed a motion for a new trial based on the jury's unauthorized use of the dictionary. The district court denied the motion for a new trial and filed a memorandum decision setting forth its findings and conclusions. The court found that the dictionary was in the jury room two hours or more on the last day of deliberations. The court also found that members of the jury consulted the dictionary for the definition of the words "conspiracy," "conspirator," "concerted," "copyright," "infringement," "plagiarism," and "doubt." The court concluded that the jury's inability to agree on a verdict on the conspiracy count eliminated any possibility that the dictionary definition of the words "conspiracy," "conspirator," and "concerted" could have prejudiced Steele. The court also determined, after comparing the dictionary definitions of "copyright" and "infringement" with the instructions read to the jury, that there was no reasonable possibility of prejudice. After noting that the word "plagiarism" was not used in any instruction, the court concluded that there was no reasonable possibility that the definition of this word would have affected the verdict. Finally, the court ruled that there was no reasonable possibility that the dictionary definition of the word "doubt" prejudiced the jury in view of the fact that the legal term "reasonable doubt" was defined in instruction No. 7 and was referred to in a number of other instructions.

Steele argues before this court that it was error to provide the jury with a dictionary. Citing a 1938 New Hampshire case, *Daniels v. Barker*, 89 N.H. 416, 200 A. 410 (1938), he asserts that "no use of the dictionary could be proper, and any use to be deemed harmless has been held to be merely conjectural." In *Daniels v. Barker*, the New Hampshire Supreme Court reversed the judgment in a civil action where the bailiff had supplied the jury with a dictionary without prior court approval, holding that, under such circumstances, "no use of the dictionary would be proper" during deliberations. *Id.* at 421, 200 A. at 415. Thus, under the New Hampshire rule reversal is automatic if a dictionary is received by the jury "without proof that the jury gave it any weight in reaching the verdict." *Id.* at 420–21, 200 A. at 415. As

we will illustrate below, that is not the law of this circuit.

■ We agree that a bailiff who furnishes a jury with a dictionary without prior court approval is guilty of misconduct. We explained in *United States v. Birges*, 723 F.2d 666 (9th Cir.1984), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 and —— U.S. ——, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984) that

> [q]uestions or disputes as to the meaning of terms which arise during jury deliberations should be settled by the court after consultation with counsel, in supplemental instructions. Such guidance will avoid the danger that jurors will use the dictionary to construct their own definitions of legal terms which do not accurately or fairly reflect applicable law.

*Id.* at 670–671.

In *United States v. Bagnariol*, 665 F.2d 877 (9th Cir.1981), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982), we set forth the procedure which must be followed by the trial court when it becomes aware that a jury has been exposed to extraneous information:

> The trial court, upon learning of a possible incident of juror misconduct, must hold an evidentiary hearing to determine the precise nature of the extraneous information. The defendant is entitled to a new trial if the judge finds a "possibility that the extrinsic material could have affected the verdict." *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979).

*Id.* at 885.

We also discussed in *Bagnariol* the standard by which we must review the trial court's determination concerning the impact of the extraneous information.

> The trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature. He or she observes the jurors throughout the trial, is aware of the defenses asserted, and has heard the evidence. The judge's conclusion about the

effect of the alleged juror misconduct deserves substantial weight.

> Nevertheless, because of the threat to the fundamental right of defendants to an impartial jury, the trial judge's determination must be consdered in the context of the entire record. We conduct an independent review of the alleged juror misconduct, but remain mindful of the trial court's conclusions.

*Id.* (citations omitted).

In *Bagnariol*, we rejected the notion that we must reverse automatically if the jury has used extraneous information. We stated in this respect:

> However simple it might be if every question on appeal could be solved by applying a per se test of some sort, that is not realistic. Cases in which convicted defendants challenge their verdicts based on alleged juror misconduct require a considered review of the details and circumstances of each case.

*Id.* (footnote omitted).

In the instant matter, the trial judge scrupulously followed the requirements we prescribed in *Bagnariol*. Upon becoming aware that the bailiff had furnished a dictionary to the jury, he advised counsel and requested their views in writing concerning the legal effect of the bailiff's improper conduct. The court then conducted an evidentiary hearing to determine the precise manner in which the jurors used the dictionary. Each juror denied using the dictionary for any purpose except to determine the meaning of words.

■ Thus, we can infer from the jurors' testimony that they did not use the dictionary to formulate their own legal standards concerning the elements of the crime of copyright infringement or the government's burden of proof. The jurors' improper use of the dictionary to determine the precise definition of several words does not require reversal unless there is a reasonable possibility that the extrinsic material could have affected the verdict. *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir.1979); *cf. State v. Suschank*, 595 S.W.2d 295, 298 (Mo.App.Ct.1979) (unautho-

rized use of dictionary by jury did not require reversal if it did not affect jury's decision); *State v. Holt,* 79 S.D. 50, 52, 107 N.W.2d 732, 733 (1961) (new trial is not required unless jury's unauthorized use of dictionary is calculated to prejudice defendant's rights); *State v. Donald,* 90 Utah 533, 537, 63 P.2d 246, 248 (1936) (prejudice should not be presumed where jury makes unauthorized use of a dictionary).

In *Gibson v. Clanon,* 633 F.2d 851 (9th Cir.1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981), we concluded that the use of a medical encyclopedia to obtain evidence declared inadmissible at trial—whether a blood type was rare and to ascertain the effect of morphine on perception—created a reasonable possibility that the extrinsic evidence affected the verdict. *Id.* at 855. We noted in *Gibson* that,

> when a jury considers *facts* that have not been introduced in evidence, a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence. In one sense the violation may be more serious than where these rights are denied at some other stage of the proceedings because the defendant may have no idea what new evidence has been considered. It is impossible to offer evidence to rebut it, to offer a curative instruction, to discuss its significances in argument to the jury, or to take other tactical steps that might ameliorate its impact.

*Id.* at 854 (emphasis added) (footnote omitted).

Steele argues that "all the dangers outlined in *Gibson* are present" where the jury consults a dictionary for the meaning of a word. The problem we addressed in *Gibson* is readily distinguishable from the question now before us. In *Gibson* two of the jurors gathered evidence which bolstered the government's case. The facts presented to jurors in this manner were not tested for their trustworthiness under our adversarial system of justice. In the matter before us, no facts were gathered, and

no evidence pointing to guilt or discrediting a defense was presented by any of the jurors.

Instead, except for the word "plagiarism" certain members of the jury consulted a dictionary for the definition of terms not defined by the court in its instructions. The word "plagiarism" was not used in any instruction. We agree with the district court that no possibility of prejudice resulted from reference to the dictionary definition of the words "conspiracy," "conspirator," or "concerted" because the jury was unable to reach a verdict on the conspiracy charge.

A more difficult question is presented regarding the impact of the jury's search for the definition of the words "copyright" and "infringement." Although they were used in several instructions, the court did not define these words. Thus, the dictionary definitions of the terms "copyright" and "infringement" are not contrary to any instruction given by the court. Webster's Third New International Dictionary defines "copyright" as "the exclusive, legally secured right to reproduce (as by writing or printing), publish, and sell...." The same source defines "infringement" as follows:

> 1: The act of infringing: BREACH, VIOLATION, NONFULFILLMENT.... 2: an encroachment or trespass on a right or privilege: TRESPASS: a: the unlawful manufacture, use, or sale of a patented or copyrighted article, such as constitutes a tort in law b: the unlawful use of a trademark or trade name.

The dictionary definition of the word "infringement" makes no reference to commercial advantage or private financial gain. The jury was instructed, however, that under 17 U.S.C. § 506(a), a person is guilty of *criminal* infringement if he "infringes a copyright wilfully and for purposes of commercial advantage or private financial gain." The jury was also instructed that an essential element of the offenses charged in Counts II and III of the indictment (unauthorized reproduction and unauthorized distribution of copyrighted motion pictures) is that "the acts of infringement

were for the purpose of commercial advantage or private financial gain."

To reverse this matter, we would have to conclude that there is a reasonable possibility that the jurors, after reading the dictionary definition of "infringement," found the defendant guilty in the absence of proof beyond a reasonable doubt that he reproduced and distributed copies of motion pictures *for the purpose of commercial advantage or private financial gain.* Reversal on the basis of this conjecture would find no support in the record and be contrary to the law of this circuit.

At Steele's request each juror was asked the following questions:

Dictionaries ordinarily are used to determine the meaning of words—is that how the dictionary in the jury room was used? Was it used in any other manner?

Each juror replied "yes" to the first question and "no" to the second. Thus, we can infer from these answers that the jurors did not use the dictionary for the purpose of creating a definition of the crimes alleged against Steele which would exclude the asserted element of proof of commercial advantage or private financial gain. As set forth above, the record also discloses that the jurors reread the instructions at the foreman's request after they had consulted the dictionary. *See United States v. Duncan,* 598 F.2d 839, 866 (4th. Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979) (jury misconduct in using dictionary not prejudicial where foreman told the jury to rely on the court's instructions).

The trial judge carefully and repeatedly instructed the jury that proof of economic advantage or private financial gain is an essential element of the crime of copyright infringement. "Absent some indication to the contrary, we must assume the jury followed the judge's instructions." *United States v. Hoelker,* 765 F.2d 1422, 1426 (9th Cir.1985) (citing *United States v. Sanford,* 673 F.2d 1070, 1072–73 (9th Cir.1982)). There is nothing in the record of the examination of each juror which indicates that

the jury disregarded the court's instructions.

Steele also claims that the dictionary definition of the word "doubt" differs from the definition of that word contained in the court's instructions. This contention is inaccurate and meritless. The court did not define the word "doubt" in any of its instructions. The court used the legal term "reasonable doubt" in 15 separate instructions. The court defined "reasonable doubt" as follows:

A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.

The dictionary consulted by the jury defines doubt as follows:

1a: uncertainty of belief or opinion ...: the subjective state of being uncertain of the truth of a statement or the reality of an event as a result of incomplete knowledge or evidence ... b: a deliberate suspension of judgment or withholding of belief ... c: a systematic weighing of the reasons for holding a belief or opinion.... 2: the condition of being objectively uncertain: a state of affairs giving rise to uncertainty, hesitation or suspense.... 3: a feeling of uncertainty.... 4: an uncertain or unsettled point or matter: DIFFICULTY.... 5: a lack of confidence: DISTRUST, SUSPICION.... 6: an inclination not to believe or accept: QUESTION....

Steele asks us to speculate that "there is a possibility the jury could have altered the Instruction definition upon a reading of the dictionary definition, and thus, in their minds, lessened the burden placed upon the prosecution by the court and by the law." There is nothing in the record which would support an inference that the jury fashioned its own definition of the term "reasonable doubt." Even if we were permitted under the law to surmise that the jury

ignored the requirement of proof beyond a *reasonable* doubt and fashioned instead a definition that placed the burden upon the government to show guilt beyond any "uncertainty," Steele could not have suffered any prejudice. Instead, removal of the requirement that the doubt or uncertainty be *reasonable* would heighten, not lessen, the heavy burden of proof already placed upon the government in criminal cases.

The record of the evidentiary hearing conducted by the trial court demonstrates that there is no reasonable possibility that the jury's unauthorized use of the dictionary affected the verdict. *See United States v. Vasquez,* 597 F.2d at 193 ("[W]e hold that the appellant is entitled to a new trial if there existed a *reasonable* possibility that the extrinsic material could have affected the verdict") (emphasis added). The court did not err in denying the motion for a new trial.

### B. Applicability of Rule 43 to Unauthorized Jury Use of a Dictionary

■ Steele asserts that under Rule 43 of the Federal Rules of Criminal Procedure, he had a right to be present and his attorney should have been informed prior to the furnishing of the dictionary to the jury. He relies on this court's decision in *United States v. Birges* for this proposition. In *Birges,* the trial judge granted the jury's request for a dictionary without consulting counsel and outside the presence of the defendant. *Birges,* 723 F.2d at 670. We held in *Birges* that the sending of a dictionary into the jury room without consulting counsel is judicial error. *Id.*

In the instant matter, the court was unaware of the jury's request. The bailiff's unauthorized conduct and the jury's use of the dictionary were extraneous to any stage of the trial. Thus, no court proceedings were conducted in the absence of the defendant and the court had no opportunity to consult counsel. We conclude that Rule 43 is inapplicable where the jury obtains a dictionary without the court's knowledge.

### C. Sufficiency of the Evidence

■ Steele argues that the court erred in denying his motion for a judgment of acquittal because the government failed to present evidence that the infringing activities were engaged in for business or commercial purposes as opposed to mere personal use, gain or profit. Steele contends that the evidence showed that he was a mere film hobbyist or collector who helped a friend by swapping or exchanging films with a friend.

The standard of review for an order denying a motion for a judgment of acquittal is whether the evidence, considered favorably to the government, was such as to permit a rational conclusion by the jury that the accused was guilty beyond a reasonable doubt. *Birges,* 723 F.2d at 672 (citing *United States v. Hazeem,* 679 F.2d 770, 772 (9th Cir.), *cert. denied,* 459 U.S. 848, 103 S.Ct. 106, 74 L.Ed.2d 95 (1982)).

The government was required to prove that the copyright infringement was "for purposes of commercial advantage or private gain." 17 U.S.C. § 506(a). Steele does not discuss the evidence presented by the government on this issue. Instead, he relies on his own testimony wherein he characterized himself as a film hobbyist who helped a friend because he felt sorry for him. Steele's testimony is irrelevant in determining the merits of his contention because the motion for a judgment of acquittal was made before he testified.

The evidence produced by the government showed that Steele sold 20 to 25 copies of motion pictures to Raymond Gurten for ten to sixty dollars. He also sold two copies to John Wallace for sixty to eighty dollars. This evidence was sufficient to permit a natural conclusion beyond a reasonable doubt that Steele was in a business for commercial or private financial gain.

### D. Ineffective Assistance of Counsel

■ Steele maintains that he received ineffective assistance of counsel because his attorney failed to object to the calling of a person not listed as a potential witness by

the government, or to interpose an objection to testimony concerning other crimes, and neglected to call persons who were listed as defense witnesses.

The competency issue is raised for the first time on this appeal. Steele's reply brief makes no reference to the foundational requirements of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), notwithstanding the fact that this case was cited in appellee's brief.

■ Under *Strickland*, a convicted defendant must show that his attorney's performance was deficient and that such ineffectiveness prejudiced the defense. 104 S.Ct. at 2064 [the volume of the United States Reports which contains this case has not yet been delivered to Los Angeles court libraries. When it is, we will insert internal page cites to the official reporter.] A reviewing court must indulge in a strong presumption that counsel's action "might be considered sound trial strategy." *Id.* at 2066 (quoting *Michel v. Louisiana*, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). On the record before this court, there are insufficient facts to overcome the presumption that trial counsel's alleged omissions were the result of sound trial strategy or an understanding that an objection would be frivolous. Had trial coursel interposed an objection to the calling of a witness whose name was not on the government's witness list, it would have been overruled under *United States v. Sukumolachan*, 610 F.2d 685, 688 (9th Cir.1980). There is no requirement that all government witnesses be included on the witness list in a non-capital case. *Id.* The government also indicated in its opening statement that the witness would be called.

Steele's trial counsel called a number of witnesses at trial including the defendant. The record is silent as to the reason that counsel chose not to present the other witnesses whose names had been listed. Under *Strickland v. Washington*, this court must presume that there were sound strategic reasons behind counsel's decision.

Steele has failed to demonstrate ineffectiveness of counsel.

E. Alleged Inconsistencies Of Jury Verdicts

■ Steele alleges that the jury's inability to reach a verdict on the conspiracy count makes the guilty verdicts on Counts II and III inconsistent. No authority has been cited to support the novel proposition that an inability to reach a verdict on one count is the equivalent of an acquittal of that charge.

Because this issue was not raised below, the alleged error must be reviewed for plain error. Fed.R.Crim.P. 52(b). No error occurred in accepting the verdicts on Counts II and III, notwithstanding the jury's inability to reach a verdict on the conspiracy charge. Consistency in verdicts is not required. *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984); *Hamling v. United States*, 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974). "A defendant can be convicted upon one or some of the counts but acquitted on another or others and the conviction will be sustained even though rationally incompatible with the acquittal." *United States v. Horowitz*, 756 F.2d 1400, 1406 (9th Cir.) (citing *United States v. Miller*, 546 F.2d 320, 325 (9th Cir.1976); *United States v. Livengood*, 427 F.2d 420, 423 (9th Cir.1970)), *cert. denied*, —— U.S. ——, 106 S.Ct. 74, 88 L.Ed.2d 60 (1985).

The judgment is AFFIRMED.